**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| MIGDAL 1, LLC dba Hyundai of Bedford | **CASE NO. 1:22-cv-01088-DAR** |
| Plaintiff, | **JUDGE DAVID A. RUIZ** |
| v. | |
| | **AMENDED COMPLAINT** |
| HYUNDAI MOTOR AMERICA CORPORATION, *et al.* | |
| Defendants. | **(JURY DEMAND ENDORSED HEREON)** |

Now comes Plaintiff Migdal 1, LLC, d/b/a Hyundai of Bedford ("HoB" or "Plaintiff"), by and through undersigned counsel, and hereby states its Amended Complaint against Defendants Hyundai Motor America Corporation ("HMA") and Genesis Motor America, LLC ("GMA") (collectively "Defendants") as follows:

**INTRODUCTION**

1.      This lawsuit was caused by Defendants' unlawful and misguided attempts to spin off Hyundai's popular Genesis motor vehicle into its own luxury brand of the same name. Instead of working with its existing network of Hyundai franchisees to smoothly effectuate this change, Defendants have instead employed coercive, exclusionary, and discriminatory tactics to force dealers to either spend millions of unnecessary dollars on new and renovated facilities, or else face a financial and competitive disadvantage that threatens their ability to do business.

2.      Plaintiff HoB is a Hyundai and Genesis franchisee in Northeast Ohio, which has sold both brands at a single location since the inception of the then Hyundai-branded Genesis model in 2008. When Hyundai attempted to convert Genesis into a separate, stand-alone brand, HoB initially agreed to sell the Genesis brand under the terms of a one-sided Participation

Agreement, which required it to redesign its display area and subject its employees to additional training and certification, just for the privilege of selling Genesis motor vehicles it already had the right to sell.

3.     When the Participation Agreements were soundly criticized and challenged as illegal by dealerships across the country, Defendants changed their approach, proposing a small, exclusive network of Genesis dealers that would exclude most of their existing Hyundai franchisees from selling Genesis motor vehicles. However, Defendants' plan was once again found to violate state law.

4.     Currently, Defendants have forced their existing Hyundai and Genesis franchisees to participate in two "financial incentive" programs, which they hope will finally ram their brand split through to the market. Under these programs, dealers are required to spend millions of dollars to renovate their existing Hyundai facilities, build brand-new facilities for stand-alone Genesis dealerships, and make all such facilities exclusive to one brand or the other. Franchisees who "play by the rules" receive payments from Defendants representing up to ten percent (10%) of their total sales, while those who do not, or cannot, comply are forced to compete against other dealerships who can price their motor vehicles far lower due to Defendants' discriminatory subsidies.

5.     Defendants' incentive programs are illegal under Ohio and federal law, and this Court should enjoin further implementation of them. Further, it should award HoB all damages it has incurred as a result of Defendants' discriminatory and improper actions.

## PARTIES, JURISDICTION, AND VENUE

6.     Plaintiff HoB is an Ohio corporation with its principal place of business in Bedford, Ohio. HoB is both a "motor vehicle dealer" and a "franchisee" as defined in R.C. Chapters 4501 and 4517.

2

7.     Defendant HMA is a California corporation with its principal place of business in Fountain Valley, Orange County, California.

8.     Defendant GMA is a California corporation with its principal place of business in Fountain Valley, Orange County, California.

9.     Defendants are both registered to conduct business in Ohio. Defendants are both "new motor vehicle manufacturers" and "franchisors" as defined in R.C. Chapters 4501 and 4517.

10.    This Court has personal jurisdiction over Defendants pursuant to R.C. 2307.382, as they (a) are both licensed by the Ohio Secretary of State to transact business in Ohio; (b) specifically transact business in Ohio by entering into contractual relationships with Ohio businesses and residents; and (c) have purposely availed themselves of the privilege of conducting business in Ohio.

11.    Venue is proper in this Court pursuant to Civ.R. 3(C), as: (a) Defendants conducted activity in Cuyahoga County which gave rise to Plaintiff's claims for relief; (b) Cuyahoga County is where all or part of Plaintiff's claims for relief arose; (c) Cuyahoga County is where Plaintiff resides; and (d) Plaintiff and Defendants have a contractual agreement to apply Ohio law in this matter.

## FACTUAL BACKGROUND

I.    **HMA's Relationship with HoB and Establishment of the Genesis Brand**

12.    HoB has been in operation since 2013, and signed a Dealer Sales and Service Agreement with HMA to operate a dealership and sell Hyundai brand motor vehicles at its facility in Bedford, Ohio ("Hyundai Agreement"). A copy of the Hyundai Agreement is not attached as it contains confidential information and is already in the possession of HMA but will be produced to the Court for *in camera* review upon request.

3

13.     The Hyundai Agreement is a "franchise" as defined in R.C. Chapter 4517.

14.     HMA is a subsidiary of Hyundai Motor Company ("HMC"), which is headquartered in Seoul, South Korea. HMA is the sole distributor of Hyundai brand motor vehicles in the United States.

15.     Beginning in 2008, HMA began distributing the Hyundai Genesis, a full-size luxury sedan, to be sold by dealerships in the United States, including HoB.

16.     In early May 2016, HMA announced that it would be rebranding the second-generation Hyundai Genesis as the G80 and selling it through its U.S. dealerships as part of a new luxury brand known as "Genesis." The G80 and future Genesis brand motor vehicles would continue to be manufactured and distributed by HMC and HMA.

17.     Even though HoB already had the right to sell all HMC-manufactured motor vehicles to the public under the Hyundai Agreement, HMA required all Hyundai dealers, including HoB, to sign a "Genesis Participation Agreement," effective May 1, 2016, in order to receive distribution of the rebranded Genesis G80 and future Genesis brand motor vehicles (the "GPA"). A copy of the GPA is not attached as it contains confidential information and is already in the possession of HMA but will be produced to the Court for *in camera* review upon request.

18.     The GPA imposed several onerous requirements on HoB and other Hyundai dealers, including a separate display area with unique signage, additional training and certification standards for sales and service employees, and certain sales and customer satisfaction benchmarks.

19.     The GPA received significant backlash from Hyundai dealers across the United States, who viewed it as requiring them to accept additional financial and organizational burdens simply for the right to continue selling certain Hyundai-manufactured motor vehicles.

4

20.     The GPA was also subject to several legal challenges throughout the United States. Upon information and belief, the GPA violated multiple provisions of R.C. Chapter 4517, also known as the Ohio Dealer Act ("ODA").

21.     Nevertheless, on April 15, 2016, HoB agreed to the GPA to ensure that it would be able to continue selling Genesis and other Hyundai-manufactured motor vehicles, and to protect its significant investment in its Hyundai franchise. Upon information and belief, all or nearly all Ohio Hyundai dealerships agreed to the GPA.

22.     HoB sold and serviced Genesis motor vehicles in the same facility it used to sell and service Hyundai-branded motor vehicles. Upon information and belief, all Ohio Hyundai dealerships who sold and serviced Genesis motor vehicles did so using their existing Hyundai facilities.

23.     In 2017, despite requiring its U.S. dealerships to sign the GPA and implement its burdensome requirements only a year earlier, HMC and HMA announced that they intended to establish Genesis as an independent entity by creating GMA and designating it, rather than HMA, as the sole distributor of Genesis motor vehicles in the United States.

24.     GMA was registered in the United States in November 2016, and is a subsidiary of Genesis Motor, LLC, which is headquartered in Seoul, South Korea. Genesis Motor, LLC was established in November 2015, and shares a parent company with HMC.

25.     Initially, GMA announced that it would be establishing a new, smaller network of hand-picked Genesis dealers throughout the United States, and that HMA would subsequently cease distributing Genesis-brand motor vehicles to Hyundai dealers.

26.     On or about March 2, 2018, HoB received a letter from GMA informing HoB that it had the option to pursue a Genesis franchise with GMA or to terminate its existing Genesis franchise in exchange for Goodwill Compensation.

27.     Upon information and belief, all existing Genesis dealers in Ohio received similar letters and offers (with differing amounts of Goodwill Compensation offered depending on certain metrics).

28.     In response to GMA's March 2018 correspondence, HoB submitted its complete "GMA Franchise – Intent to Apply" form on March 29, 2018, expressing its interest in a Genesis franchise for the Cleveland Suburbs – East market and rejecting GMA's proposal to terminate HoB's existing Genesis franchise.

29.     GMA's plan to create an exclusive network of hand-picked Genesis dealerships was, however, opposed by many Hyundai dealers, as a majority of those already selling Genesis-brand motor vehicles — many of whom had made significant investments in their businesses to do so — would likely be excluded from the smaller Genesis network.

30.     GMA's plan was also significantly derailed when several states, including Florida and Louisiana, denied GMA's application for a distributor license, on the basis that state law prohibited HMA and GMA from treating existing Hyundai dealers differently with regard to the opportunity to have a Genesis franchise.

31.     As a result of its difficulties in establishing its hand-picked dealer network, GMA announced in approximately May 2018 that it would be offering all existing Hyundai franchisees the opportunity to become Genesis franchisees as well.

32.     Thereafter, HoB received another letter from GMA, along with a proposed Genesis Dealer Sales and Service Agreement ("Genesis Agreement"). This letter gave HoB the option of

either: (a) signing an enclosed "Expression of Interest to Be a Genesis Dealer," upon which GMA would send a personalized execution copy of the Genesis Agreement; or (b) executing an enclosed "Settlement and Release Agreement," under which HoB would relinquish all claims against HMA and GMA related to the GPA and Genesis products, and would give up its right to sell or service Genesis motor vehicles, in exchange for a buyout payment.

33.     After significant internal debate, HoB agreed to forego the buyout payment, and signed the "Expression of Interest to Be a Genesis Dealer" on November 16, 2018. Subsequently, HoB signed a Genesis Agreement with GMA on April 3, 2019. A copy of the Genesis Agreement is not attached as it contains confidential information and is already in the possession of GMA but will be produced to the Court for *in camera* review upon request.

## II.     HoB Constructs a Brand New, State of the Art, Dual Hyundai and Genesis Facility

34.     Since its inception, HoB has sold both Hyundai and Genesis model and/or branded automobiles out of the same facility.

35.     As explained above, in or around 2016, HMA (and subsequently, GMA), undertook an effort to separate the Genesis brand from Hyundai.

36.     As part of these efforts, HMA and GMA desired separate spaces and branding details within Hyundai/Genesis dealerships to create a separate Genesis identify.

37.     In furtherance of these efforts to separate Genesis from Hyundai, HMA and GMA began pressuring HoB to build a new dual Hyundai/Genesis facility that provided separate spaces within the dealership for Hyundai and Genesis vehicles, with approximately one third (1/3) of the facility dedicated exclusively to Genesis and the other two thirds (2/3) dedicated exclusively to Hyundai.

38.     HoB ultimately acquiesced to HMA and GMA's wishes and undertook construction of a new dual Hyundai/Genesis facility (the "New Facility"), breaking ground in May 2018.

39.     To design the New Facility, HoB enlisted the services an architect specifically designated by HMA and GMA for Hyundai/Genesis facility design.

40.     The initial plans for the New Facility — drawn up by the architect designated by HMA and GMA — were approved in all respects by GMA and HMA and were confirmed to meet all then-existing facility incentive programs offered by HMA and/or GMA.

41.     Approximately two (2) months prior to breaking ground, HMA and GMA informed HoB that they wanted the plans for the New Facility to be changed in certain respects.

42.     As a result, HoB reengaged the architect designated by HMA and GMA to revise the plans for the New Facility to meet the new design requirements imposed by HMA and GMA, at a cost of tens of thousands of dollars to HoB.

43.     The revised plans for the New Facility — again, drawn up by the architect designated by HMA and GMA — were approved in all respects by GMA and HMA and were confirmed to meet all then-existing facility incentive programs offered by HMA and/or GMA.

44.     Notably, the design for the New Facility is not what HoB would have chosen had it been able to choose its own design. Instead, the New Facility is the design that was created and approved by HMA and GMA.

45.     Construction of the New Facility was completed on or about May 1, 2019.

46.     All in, the New Facility cost HoB in excess of $6,000,000.00 to build.

III.    **Defendants' Accelerate and Keystone Programs Force Dealers to Comply with Harsh Requirements to Avoid Financial and Competitive Disadvantages**

47.     In approximately January 2020, with no advance notice, Defendants announced the "Hyundai Accelerate Program" ("Accelerate Program") and "Genesis Keystone Program"

("Keystone Program") (collectively, the "Illegal Programs"), two purported "incentive" programs for Hyundai and Genesis dealers. Copies of the Illegal Incentive Programs are not attached as they are voluminous and are already in the possession of HMA and GMA but will be produced to the Court for *in camera* review upon request.

48.     Upon information and belief, the purpose of the Illegal Programs was to achieve Defendants' goal of creating a small, exclusive Genesis dealer network — which they had previously pursued via other unlawful means — by forcing dealers who held both Hyundai and Genesis franchises to either spend millions of dollars on stand-alone Genesis facilities or abandon their Genesis franchises due to an inability to compete.

### A.     The Hyundai Accelerate Program

49.     Under the Accelerate Program, Hyundai dealers are required to implement HMA's Global Dealership Space Identity 2.0 ("GDSI 2.0"), a manufacturer-created design standard for the interior and exterior of Hyundai facilities, and to make their facilities exclusive to Hyundai.

50.     To fully comply with the Accelerate Program, a franchisee must commit to renovating its Hyundai facilities in accordance with GDSI 2.0, commence and complete construction within a specified time period, and make its facilities Hyundai exclusive by removing all operations and indicia of any other brand, including Genesis.

51.     In fact, the "Official Program Rules" for the Accelerate Program, which HMA distributed to HoB and other Hyundai franchisees, specify that "all Genesis customer touchpoints [must be] removed from Facility" to achieve compliance with HMA's exclusivity requirements.

52.     Hyundai dealers who fully comply with the Accelerate Program receive "Support Payments" from HMA in the amount of one percent (1%) of the MSRP on all eligible Hyundai

motor vehicles sold by the dealership during construction, and then two percent (2%) of the MSRP on all eligible Hyundai vehicles sold from construction completion through June 30, 2026.

53.     Upon information and belief, the cost of fully complying with the Accelerate Program is potentially millions of dollars, as it requires a full or partial renovation of a Hyundai franchisee's sales and service facilities, a reversion of the burdensome requirements imposed by the GPA in 2016, and either accommodations for, or the abandonment of, any Genesis franchise which was operated out of the Hyundai facilities.

54.     Further, any Hyundai franchisee interested in an estimate of the cost of compliance with the Accelerate Program was forced by HMA to pay $15,000 simply for a "cost survey."

55.     Under the Accelerate Program's "Official Program Rules," HoB was required to commence renovations on its New Facility (again, which was designed and approved by HMA, and which was completed on May 1, 2019) by December 31, 2021 in order to qualify for full "Support Payments" from HMA. To date, HoB has not commenced renovations of its New Facility, and is therefore not eligible to receive any "Support Payments" under the Accelerate Program

### B.      The Genesis Keystone Program

56.     Under the Keystone Program, Genesis dealers are required to build separate, stand-alone sales and service facilities which are exclusive to Genesis.

57.     To fully comply with the Keystone Program, a franchisee must commit to building or renovating a new facility according to GMA's Retail Design guidelines, commence and complete construction within a specified time period, and make its facilities Genesis exclusive pursuant to GMA's Facility Exclusivity Policy.

58.     Genesis dealers who fully comply with the Keystone Program receive "Support Payments" from GMA in the amount of two percent (2%) of the MSRP on all eligible Genesis motor vehicles sold by the dealership during construction, and then four percent (4%) of the MSRP on all eligible Genesis vehicles sold from construction completion through June 30, 2025.

59.     In addition, GMA offers a "Leadership Bonus" of an additional four percent (4%) of the MSRP on all eligible Genesis vehicles to franchisees who comply with every component of the Keystone Program.

60.     Upon information and belief, the cost of fully complying with the Keystone Program is potentially millions of dollars, as it requires the acquisition of commercial real estate suitable for a motor vehicle dealership, and then construction of stand-alone Genesis sales and service facilities which cannot be used for any other brand.

61.     Further, building stand-alone Genesis facilities is not financially viable or beneficial for HoB and, upon information and belief, many other Genesis franchisees, based on the current volume of Genesis motor vehicles currently being sold by dual Hyundai and Genesis dealerships.

62.     HoB has not complied with the Keystone Program, and is therefore not eligible to receive any "Support Payments" thereunder. Under the "Facility Program Rules" for the Keystone Program, HoB must commence construction of a new Genesis facility by December 30, 2022 (despite the fact it just completed construction of the New Facility, which was designed and approved by GMA, on May 1, 2019) and complete construction by December 30, 2024 in order to qualify for full "Support Payments" from GMA.

### C.     The Consequences of Non-Compliance with the Illegal Programs

63.     Although Defendants mischaracterize their "Support Payments" under the Accelerate Program and Keystone Program as "incentives," in reality they represent a potential ten percent (10%) additional gross margin for dealers who hold both Hyundai and Genesis franchises and comply with all requirements of the Illegal Programs.

64.     Such "incentive programs" are used by franchisors like Defendants to coerce dealers into taking certain actions — including building expensive facility upgrades — which benefit the franchisors but provide little or no benefit to dealers or consumers.

65.     In the past, franchisors like Defendants sold new motor vehicles to dealers at wholesale prices significantly less than MSRP, which allowed dealers to achieve a fair profit on each motor vehicle sold.

66.     Over time, however, franchisors have significantly reduced the margin between wholesale prices and MSRP, so much so that many dealers regularly sell new motor vehicles for little to no profit in order to remain competitive in the marketplace.

67.     As a result, dealers have become increasingly reliant on "incentive" or "bonus" programs, like Defendants' Illegal Programs, as a basis for dealers' profitability and long-term viability.

68.     Here, Defendants are utilizing the Illegal Programs to force Hyundai and Genesis dealers to spend millions of dollars on new and renovated facilities, each of which must be exclusive to either Hyundai or Genesis. This creates a more visible and formal split between the brands, which Defendants have been trying to achieve — mostly through illegal and unpopular means — since announcing the separate Genesis brand in 2016.

69.     Franchisees who are unwilling or unable to comply with Defendants' arbitrary and burdensome demands under the Illegal Programs suffer an immediate financial consequence, as they are ineligible for potentially hundreds of thousands of dollars in annual "Support Payments."

70.     Further, noncomplying dealers are placed at a distinct competitive disadvantage compared to dealers who comply with the Illegal Programs, as the latter benefit from a significantly decreased effective wholesale cost for the Hyundai and Genesis motor vehicles they sell, and are therefore able to lower their prices. This disadvantage compounds over time, as complying dealers' lower prices lead to additional sales, which in turn lead to additional payments under the Illegal Programs.

71.     The competitive disadvantage caused by the Illegal Programs negatively affects a noncomplying dealer's sales, ability to make a profit, and long-term viability. It can also cause the constructive termination of certain franchises, by driving customers and sales toward dealers who receive additional revenue under the Illegal Programs (and can therefore lower prices) and away from dealers who were unwilling or unable to comply, who are then forced out of business.

72.     By tying a significant portion of a Hyundai or Genesis dealer's profit margin to compliance with the Illegal Programs, Defendants impose on HoB and other dealers a nearly impossible choice: either spend millions of dollars on unjustifiable facility improvements — which may never be fully reimbursed — or risk not being able to compete with dealers who comply with the Illegal Programs and are therefore able to offer significantly lower prices.

73.     With regard to the Keystone Program, Defendants have effectively offered Genesis dealers a third option: terminate the franchise entirely. This result, like the buyout payments offered to Hyundai franchisees in October 2018, ultimately advances Defendants' goal of reducing the number of Genesis dealers in the United States, at the cost of its franchisees.

13

74.     Defendants have not provided HoB or, upon information and belief, any other Hyundai or Genesis franchisee with any report, evaluation, analysis, or other evidence showing that the requirements of the Illegal Programs are reasonable in light of current market and economic conditions.

75.     Likewise, Defendants have not provided HoB or, upon information and belief, any other Hyundai or Genesis franchisee with any report, evaluation, analysis, or other evidence showing that the millions of dollars of expenditures required to comply with the Illegal Programs will be recouped by the franchisees in the form of "Support Payments," increased sales, or any other financial benefit.

## COUNT I
### Violation of the Ohio Dealer Act—R.C. 4517.59

76.     HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

77.     HoB is both a "new motor vehicle dealer" and "franchisee" of both HMA and GMA, as defined by the ODA.

78.     Defendants are both "manufacturers" and "franchisors" as defined by the ODA.

79.     R.C. 4517.59(A)(1) provides that no franchisor shall, "[i]n acting or purporting to act under the terms, provisions, or conditions of a franchise or in terminating, canceling, or failing to renew a franchise, fail to act in good faith."

80.     R.C. 4517.59(A)(6)(f) provides that no franchisor shall "[e]mploy any coercive techniques for any other purposes such as obtaining franchisee participation in contests, 'giveaways,' or sales devices."

81.     R.C. 4517.59(A)(8) provides that no franchisor shall "[f]ail or refuse to make equally available to its same line-make franchisees all motor vehicles, motor vehicle parts, or other

14

products manufactured for that line-make at the same actual price, or to utilize any device including, but not limited to, sales promotion plans or programs that result in such lesser actual price."

82.    R.C. 4517.59(A)(8) also provides that "[a] franchisor has not made a motor vehicle, motor vehicle part, or other product available to all line-make franchisees if the franchisor does any of the following: (a) Requires a franchisee to remodel, renovate, or recondition the new motor vehicle dealer's existing dealership facilities as a prerequisite to receiving the model, part, or product, unless reasonably necessary to accommodate the adequate sale and service of a vehicle based on the technology of that vehicle."

83.    R.C. 4517.59(A)(15) provides that no franchisor shall "[e]ngage in any predatory practice or discriminate against any new motor vehicle dealer including discriminating against a franchisee, as compared to a same line-make franchisee, with regard to motor vehicle allocation, motor vehicle sales expectations, motor vehicle market penetration, motor vehicle planning volume requirements, customer service satisfaction requirements, dealership facility requirements, or dealer capitalization requirements."

84.    R.C. 4517.59(A)(23) provides that no franchisor shall "[r]equire, coerce, or attempt to coerce any new motor vehicle dealer in this state to change the location of the dealership, or to make any substantial alterations to the dealership premises or facilities, if . . . (i) [t]he proposed change or alteration would be unreasonable in light of the current market and economic conditions."

85.    R.C. 4517.59(A)(27) provides that no franchisor shall "[u]nreasonably require a franchisee to establish or maintain exclusive sales facilities, sales display space, personnel, service, parts, or administrative facilities for a line-make, unless such exclusivity is reasonable and

15

otherwise justified by reasonable business considerations. In making that determination, the franchisor shall take into consideration the franchisee's satisfaction of facility requirements as required by the franchise agreement. The franchisor shall have the burden of proving that reasonable business considerations justify exclusivity."

86.     R.C. 4517.59(B)(1) provides that "[n]o franchisor shall discriminate among the franchisor's dealers in any program that provides assistance to the franchisor's dealers."

87.     As described herein, Defendants' actions, and in particular the Illegal Programs, were undertaken in bad faith, and designed to coerce HoB and other Hyundai and Genesis dealers into making unnecessary and unjustifiable facility upgrades.

88.     Further, the Illegal Programs constitute price discrimination and disparate treatment among Defendants' dealers, as the "Support Payments" offered under the Illegal Programs put complying dealers at a significant competitive advantage, and dealers like HoB who have not complied with the Illegal Programs at a significant competitive disadvantage that threatens their profitability and long-term viability as a going concern.

89.     As such, the Illegal Programs and Defendants' related actions constitute violations of R.C. 4517.59.

90.     R.C. 4517.65(A) provides that "[w]hen a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, plus court costs and reasonable attorney fees."

91.     As a direct and proximate result of Defendants' violations of the ODA and R.C. 4517.59, HoB has suffered, and will continue to suffer, damages in an amount to be proven at trial in excess of $25,000.00.

## COUNT II
### Violation of the Ohio Dealer Act—R.C. 4517.54

92.　　HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

93.　　HoB is a "franchisee" of both HMA and GMA, as defined by the ODA.

94.　　Defendants are both "franchisors" as defined by the ODA.

95.　　HoB and HMA are parties to the Hyundai Agreement, which sets forth the terms and conditions of HoB's franchise from HMA. Upon information and belief, HMA is in possession of a full copy of Hyundai Agreement.

96.　　HoB and GMA are parties to the Genesis Agreement, which sets forth the terms and condition of HoB's franchise from GMA. Upon information and belief, GMA is in possession of a full copy of the Genesis Agreement.

97.　　R.C. 4517.54(A) provides that, "[n]otwithstanding the terms, provisions, or conditions of an existing franchise, no franchisor shall terminate, cancel, or fail to continue to renew a franchise except for good cause.

98.　　HMA's Accelerate Program, which constitutes price discrimination and places non-complying dealers like HoB at a significant competitive disadvantage that threatens their profitability and long-term viability, constitutes a constructive termination of the Hyundai Agreement and HoB's Hyundai franchise without good cause.

99.　　GMA's Keystone Program, which constitutes price discrimination and places non-complying dealers like HoB at a significant competitive disadvantage that threatens their profitability and long-term viability, constitutes a constructive termination of the Genesis Agreement and HoB's Genesis franchise without good cause.

100.     Further, GMA's Keystone Program, which coerces HoB to terminate its Genesis franchise if it is unwilling or unable to spend millions of dollars on a new, stand-alone Genesis sales and service facility, constitutes a constructive termination of the Genesis Agreement and HoB's Genesis franchise without good cause.

101.     As such, the Illegal Programs and Defendants' related actions constitute violations of R.C. 4517.54.

102.     R.C. 4517.65(A) provides that "[w]hen a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, plus court costs and reasonable attorney fees."

103.     As a direct and proximate result of Defendants' violations of the ODA and R.C. 4517.54, HoB has suffered, and will continue to suffer, damages in an amount to be proven at trial in excess of $25,000.00.

## COUNT III
### Violation of the Ohio Dealer Act—R.C. 4517.59

104.     HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

105.     HoB is a "motor vehicle dealer" as defined by the ODA and as contemplated in R.C. 4517.59.

106.     Defendants are both "franchisors" as defined by the ODA.

107.     HoB and HMA are parties to the Hyundai Agreement, which sets forth the terms and conditions of HoB's franchise from HMA. Upon information and belief, HMA is in possession of a full copy of Hyundai Agreement.

108.    HoB and GMA are parties to the Genesis Agreement, which sets forth the terms and condition of HoB's franchise from GMA. Upon information and belief, GMA is in possession of a full copy of the Genesis Agreement.

109.    R.C. 4517.59(A)(23)(a) provides that, notwithstanding the terms, provisions, or conditions of any agreement, franchise, or waiver, no franchisor shall "Require, coerce, or attempt to coerce any new motor vehicle dealer in this state to change the location of the dealership, or to make any substantial alterations to the dealership premises or facilities, if any of the following apply: (i) The proposed change or alteration would be unreasonable in light of the current market and economic conditions * * * (ii) The change or alteration is proposed without a written estimation of a sufficient supply of new motor vehicles so as to justify the location change or alterations in light of the current market and economic conditions * * * (iii) The change or alteration is proposed within seven years after the dealership premises was constructed or altered, as approved by the franchisor unless the change or alteration is necessary to comply with a health or safety law, or a technology requirement that is essential to the sale or service of a motor vehicle that the new motor vehicle dealer is authorized by the franchisor to sell or service."

110.    As set forth above, HoB completed construction of its New Facility on May 1, 2019.

111.    The New Facility will not be seven (7) years old until May 1, 2026.

112.    The New Facility was designed, approved, and confirmed to meet all then-existing facility requirements by HMA and GMA.

113.    HoB built the New Facility at urging of HMA and GMA.

114.    The New Facility cost HoB in excess of $6,000,000.00 to build.

115. HMA is in violation of the ODA and R.C. 4517.59 by requiring HoB to renovate the New Facility in order to receive the Accelerate Program's incentive payments, despite the fact the New Facility (which was designed and approved by HMA) is less than seven (7) years old.

116. GMA is in violation of the ODA and R.C. 4517.59 by requiring HoB to construct a new, stand alone, Genesis facility in order to the Keystone Program's incentive payments, despite the fact the New Facility (which was designed and approved by GMA) is less than (7) years old.

117. As a direct and proximate result of Defendants' violations of the ODA and R.C. 4517.59, HoB has suffered, and will continue to suffer, damages in an amount to be proven at trial in excess of $25,000.00.

<u>COUNT IV</u>
**Violation of the Ohio Dealer Act—R.C. 4517.59**

118. HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

119. HoB is both a "new motor vehicle dealer" and "franchisee" of both HMA and GMA, as defined by the ODA.

120. Defendants are both "manufacturers" and "franchisors" as defined by the ODA.

121. R.C. 4517.59(A)(6)(b) provides that no franchisor shall "[w]ithhold or delay delivery of motor vehicles out of the ordinary course of business."

122. R.C. 4517.59(A)(6)(c) provides that no franchisor shall "[d]iscriminate against any franchisee in the allocation or through the withholding from delivery of certain models of motor vehicles ordered by a franchisee out of the ordinary course of business."

123. R.C. 4517.59(A)(6)(c) provides that no franchisor shall "[u]nfairly change or amend unilaterally a franchisee's allotment of motor vehicles or quota, sales expectancy, sales penetration, or geographic area of responsibility without reasonable cause."

20

124.     R.C. 4517.59(A)(15) provides that no franchisor shall "[e]ngage in any predatory practice or discriminate against any new motor vehicle dealer including discriminating against a franchise, as compared to a same line-make franchisee, with regard to motor vehicle allocation, motor vehicle sales expectations, motor vehicle market penetration, motor vehicle planning volume requirements, customer service satisfaction requirements, dealership facility requirements, or dealer capitalization requirements."

125.     Upon information and belief, since HoB filed the Complaint in the above-captioned action, HMA and GMA have unfairly retaliated against it by reducing the number of Hyundai and Genesis vehicles allocated to its dealerships, thereby significantly reducing HoB's inventory and ability to generate sales and revenue.

126.     As such, Defendants' actions constitute violations of R.C. 4517.59.

127.     R.C. 4517.65(A) provides that "[w]hen a franchisor does, causes, or permits to be done anything prohibited by this chapter, or fails to perform any duty imposed upon it by this chapter, the franchisor shall be liable to the franchisee in double the amount of actual damages sustained, plus court costs and reasonable attorney fees."

128.     As a direct and proximate result of Defendants' violations of the ODA and R.C. 4517.59, HoB has suffered, and will continue to suffer, damages in an amount to be proven at trial in excess of $25,000.00.

## COUNT V
### Breach of Contract

129.     HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

130.    Prior to the Accelerate Program, Hyundai enacted various other incentive programs through which it would make incentive payments to Hyundai dealers that complied with HMA's then-existing facility requirements.

131.    The Hyundai Agreement and all Hyundai incentive programs issued thereunder constitute valid and enforceable contracts between HMA and HoB.

132.    HMA designed the New Facility.

133.    HMA approved the New Facility.

134.    HMA confirmed to HoB that the New Facility met all then-existing Hyundai facility requirements.

135.    HMA confirmed to HoB that the New Facility would entitle HoB to full HMA incentive payments under HMA's then-existing incentive program(s).

136.    HoB duly and properly performed all its obligations under the Hyundai Agreement and the Hyundai incentive programs in effect from May 1, 2019 through December 31, 2021.

137.    Despite building the New Facility at the urging of HMA, having the New Facility designed and approved by HMA, and HMA confirming that the New Facility would entitle HoB to full incentive payments under HMA's then-existing incentive programs, HMA failed to pay HoB the incentive payments to which it was entitled, totaling at least hundreds of thousands of dollars.

138.    By its actions as described in this Amended Complaint, HMA further breached its implied duty of good faith and fair dealing with regard to the Hyundai Agreement and the incentive programs enacted thereunder.

139.    As a direct and proximate result of HMA's breaches of the Hyundai Agreement and the incentive programs enacted by HMA thereunder, HoB has been damaged in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT VI
### Fraud

140.    HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

141.    Beginning in early 2018, and in response to pressure from HMA and GMA, HoB agreed to construct the New Facility, which would be used to sell both Hyundai and Genesis vehicles.

142.    HoB was required to hire an architect specifically designated by HMA and GMA to design the plans for the New Facility, and to submit all plans to HMA and GMA for their approval to ensure compliance with all applicable HMA and GMA facility requirements.

143.    After approving the initial plans for the New Facility in approximately March 2018, HMA and GMA informed HoB that certain changes were needed, and HoB was required to re-hire the designated architect to revise the plans.

144.    HMA and GMA subsequently approved the revised plans for the New Facility, and HoB broke ground in May 2018.

145.    Construction of the New Facility was completed on approximately May 1, 2019, at a total cost in excess of $6,000,000.00.

146.    Prior to and during the construction of the New Facility, HMA and GMA represented to HoB that the plans for the New Facility complied with their facility requirements and incentive programs, and that HoB would be permitted to continue selling both Hyundai and Genesis vehicles out of a dual or combined facility.

147.    HoB justifiably relied on HMA and GMA's false representations by agreeing to build the New Facility, hire HMA and GMA's designated architect, and invest millions of dollars into a new dual Hyundai/Genesis facility that would comply with HMA's and GMA's then-existing facility design guidelines.

148.    However, upon information and belief, HMA and GMA's representations were either knowingly false or made with utter disregard and recklessness as to their falsity, as Defendants had already begun developing GDSI 2.0 and the Illegal Programs, which would require Hyundai and Genesis dealers to: (a) renovate their existing facilities to be in compliance with GDSI 2.0; (b) make their existing facilities Hyundai-exclusive by removing all references to Genesis; and (c) construct new stand-alone Genesis facilities in order to comply with Defendants' facility and incentive program requirements.

149.    These false representations were material to HoB's decision and agreement to build the New Facility. HoB would not have done so had HMA and GMA disclosed: (a) that they were in the process of developing new design standards and incentive programs that would require Hyundai and Genesis franchisees to make significant investments in the renovation of existing facilities and the construction of new facilities; and (b) that the New Facility would not be in compliance with HMA and GMA's new facility and incentive program requirements.

150.    Fewer than nine (9) months after HoB completed construction of the New Facility, Defendants announced—with no advance notice—the Illegal Programs, which were intended to force dual Hyundai/Genesis franchisees to either spend millions of dollars on stand-alone facilities or abandon their Genesis franchises.

151.    As a result of Defendants' fraudulent misrepresentations, HoB has suffered damages in an amount to be proven at trial in excess of $25,000.00.

## COUNT VII
### Violation of the Robinson-Patman Act—15 U.S.C. § 13

152.    HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

153.    15 U.S.C. §13(a), which is part of the Robinson-Patman Act and the Clayton Antitrust Act, provides that:

> It shall be unlawful for any person engaged in commerce * * * to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination.

154.    Defendants are motor vehicle distributors engaged in the sale of new motor vehicles to their dealer networks in the United States through interstate commerce. New Hyundai- and Genesis-brand motor vehicles which Defendants distribute and sell to HoB and its competitor franchisees are manufactured in the United States, Mexico, and outside North America and transported across state lines to HoB and its competitor franchisees for resale to consumers.

155.    By way of the "Support Payments" and other incentives offered through the Illegal Programs, Defendants have sold, and currently sell, new Hyundai- and Genesis-brand motor vehicles of like grade and quality to competitors of HoB at lower prices than the prices at which those motor vehicles are sold to HoB.

156.    The differences in pricing caused by Defendants' Illegal Programs are not based on: (a) any change in the cost to manufacture, deliver, or sell new Hyundai and Genesis motor vehicles; (b) any change in the methods or qualities of motor vehicles being delivered to HoB and

other dealers; (c) any changing market conditions affecting the marketability of the new motor vehicles at issue; or (d) Defendants' good-faith efforts to compete with other motor vehicle manufacturers.

157.    HoB competes with other Hyundai and Genesis dealers located in the Cleveland and Northeast Ohio markets that pay, or will pay, lower prices for new Hyundai- and Genesis-brand motor vehicles as a result of the "Support Payments" offered through the Illegal Programs.

158.    The favored franchisees who receive the benefit of Defendants' price discrimination do not provide any service or savings to Defendants that is not provided in identical kind by HoB. Each HMA and GMA franchisee maintains an inventory of purchased motor vehicles on dealership property and competes to sell and service Hyundai and Genesis motor vehicles pursuant to their franchise agreements with Defendants.

159.    As a direct and proximate result of Defendants' violations of the Robinson-Patman Act, HoB has suffered, and will continue to suffer, lost sales and lost profits to competitors who benefit from Defendants' discriminatory Illegal Programs. HoB's injuries are precisely the kind which the Robinson-Patman Act was intended to prevent, as they flow directly from Defendants' unlawful conduct.

160.    As a direct and proximate result of Defendants' violations of the Robinson-Patman Act, HoB has suffered, and will continue to suffer, damages in an amount to be proven at trial in excess of $25,000.00.

161.    Further, pursuant to 15 U.S.C. §§ 15(a) and 26, HoB is entitled to treble damages, pre- and post-judgment interest, attorneys' fees, and costs as a result of Defendants' violations.

## COUNT VIII
### Violation of the Automobile Dealer's Day in Court Act—15 U.S.C. §§ 1221, *et seq.*

162.    HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

163.    The Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221 *et seq.* ("ADDCA"), provides automobile dealers with a cause of action against an automobile manufacturer or distributor that has failed to act in good faith regarding a franchise.

164.    HoB is an "automobile dealer" as defined by 15 U.S.C. § 1221(c).

165.    Defendants are "automobile manufacturers" as defined by 15 U.S.C. § 1221(a).

166.    The Hyundai Agreement between HoB and HMA is a "franchise" as defined by 15 U.S.C. § 1221(b).

167.    The Genesis Agreement between HoB and GMA is a "franchise" as defined by 15 U.S.C. § 1221(b).

168.    Defendants' bad faith and wrongful actions, as set forth herein, constitute violations of the ADDCA.

169.    As a direct and proximate result of Defendants' violations of the ADDCA, HoB has suffered, and will continue to suffer, damages in an amount to be proven at trial in excess of $25,000.00.

## COUNT IX
### Declaratory Judgment—R.C. 2721.03

170.    HoB incorporates by reference the foregoing allegations in this Amended Complaint as if fully stated herein.

171.    As described herein, Defendants' Accelerate Program and Keystone Program are in bad faith, constitute price discrimination and disparate treatment, and violate multiple provisions of the Ohio Dealer Act, specifically R.C. 4517.54 and 4517.59.

172.    However, Defendants continue to apply and promote the Accelerate Program and the Keystone Program in Ohio, coercing Hyundai and Genesis franchisees, including HoB, into complying with their burdensome requirements despite their illegality.

173.    There is a real, substantial controversy between the parties as to whether the Accelerate Program and the Keystone Program violate Ohio law, and whether Defendants have the legal right to continue implementing them against HoB and other Hyundai and Genesis franchisees in this state.

174.    This Court has jurisdiction to resolve this controversy, and issue a declaratory judgment that will clarify and preserve the rights, duties, and obligations of the parties, whether or not further relief is or could be sought.

175.    Immediate resolution and relief is necessary to preserve HoB's rights in this matter, as it must begin complying with the Accelerate Program by December 31, 2021 and the Keystone Program on December 30, 2022 in order to receive full "Support Payments" from Defendants.

176.    Therefore, HoB requests a declaratory judgment from this Court, pursuant to R.C. 2721.03, that Defendants' Illegal Programs violate Ohio law, and a preliminary and permanent injunction restraining Defendants' continued implementation of the Illegal Programs.

WHEREFORE, HoB demands judgment against Defendants, jointly and severally, and prays unto the Court for the following relief:

1.    As to Counts I, II, III, and IV, judgment in favor of HoB and against Defendants for double compensatory damages, in an amount to be proven at trial in excess of $25,000.00, and

a preliminary and permanent injunction restraining Defendants' continued implementation of unlawful and discriminatory Accelerate Program and Keystone Program;

2.      As to Count V, judgment in favor of HoB and against HMA in an amount to be proven at trial in excess of $25,000.00;

3.      As to Count VI, judgment and punitive damages in favor of HoB and against Defendants in an amount to be proven at trial in excess of $25,000.00

4.      As to Count VII, judgment in favor of HoB and against Defendants for treble compensatory damages, in an amount to be proven at trial in excess of $25,000.00, and a preliminary and permanent injunction restraining Defendants' continued implementation of the unlawful and discriminatory Accelerate Program and Keystone Program;

5.      As to Count VIII, judgment in favor of HoB and against Defendants in an amount to be proven at trial in excess of $25,000.00;

6.      As to Count IX, a declaratory judgment that the Accelerate Program and Keystone Program violate Ohio law, and a preliminary and permanent injunction restraining Defendants' continued implementation of the Illegal Programs; and

7.      On all counts, pre- and post-judgment interest, reasonable attorney's fees and costs as permitted by law, costs of collection, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Sean T. Koran*
Mark R. Koberna (038985)
Rick D. Sonkin (0038771)
Sean T. Koran (0085539)
SONKIN & KOBERNA, LLC
3401 Enterprise Parkway, Suite 400
Cleveland, Ohio 44122
Telephone: (216) 514-8300
Facsimile: (216) 514-4467
mkoberna@sklawllc.com
rsonkin@sklawllc.com
skoran@sklawllc.com

*Counsel for Plaintiff Migdal 1, LLC*

## **JURY DEMAND**

Plaintiff Migdal 1, LLC hereby demands a trial by a jury of the maximum number allowed by law.

/s/ Sean T. Koran
Sean T. Koran (0085539)

*Counsel for Plaintiff Migdal 1, LLC dba*
*Hyundai of Bedford*

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing was filed electronically via the Court's CM/ECF filing system this 2nd day of November, 2022, which shall serve a copy upon all counsel of record.

/s/ Sean T. Koran
Sean T. Koran (0085539)

*Counsel for Plaintiff Migdal 1, LLC dba*
*Hyundai of Bedford*